DAVID SYME *et al. vs.* ARCHIBALD McNEIL *et al.*

JUNE 24, 1919.

PRESENT: Parkhurst, C. J., Sweetland, Vincent, Stearns, and Rathbun, JJ.

*(1)   New Trial.*

While the denial of a motion for new trial is a formal approval of a verdict, yet where it is evident from the decision of the justice that the verdict in the opinion of the trial court failed to do justice between the parties and would have been set aside had the court felt it was possessed of the power to do so, the conclusion of the justice cannot be given the weight and consideration to which it might otherwise be entitled.

ASSUMPSIT.   Heard on exceptions of defendant and sustained.

VINCENT, J.   This is an action in assumpsit brought to recover an amount alleged to be due to the plaintiff Syme on account of labor and materials furnished in the erection of a dwelling house situated at a place called Musicolony, in the town of Westerly, Rhode Island.   The case was tried to a jury in the Superior Court and a verdict was rendered for the plaintiffs in the sum of $4,113.72.   The defendants' motion for a new trial was denied.   The case is now before us upon the defendants' exceptions to the rulings of the trial court, (1) refusing to strike out certain testimony, (2) to the refusal to direct a verdict, and (3) to the denial of the defendants' motion for a new trial.

On September 14, 1914, a contract in writing was entered into between Connor & Syme, contractors, and Archibald and Jean McNeil, whereby it was provided that the plaintiffs should erect, for the defendant Jean McNeil, a house at Musicolony in accordance with certain specifications which were made a part of said contract, at a total cost of $4,500.

From the date of the contract, September 14, 1914, to December 24, 1914, Connor appears to have had the active management, supervision and control of the work.   On and after December 24, 1914, Connor seems to have vanished so far as his further connection with the work was concerned.

On the 20th of February, 1915, following the elimination of Connor, Syme and Mrs. McNeil entered into a new contract for the completion of the work, as follows: "This agreement entered into this 20th day of February, 1915, by and between Jean M. McNeil, of the city of Bridgeport, county of Fairfield and state of Connecticut, as party of the first part, and David Syme, of Westerly, Rhode Island, party of the second part.

## WITNESSETH:

1. Both parties to this contract hereby agree that the contract made by and between Jean M. McNeil and Connor and Syme on the 14th day of September, 1914, shall be superseded entirely by this agreement and that each of the parties hereto shall not in any way hold each other liable in any manner upon the said contract or upon any of the circumstances arising out of the manner of the execution of the said preceding contract.

2. The party of the first part hereby promises and agrees to employ the party of the second part to complete the dwelling house which is being erected for the party of the first part on a plot of ground located in Musicolony, town of Westerly, state of Rhode Island and to pay him therefor the sum of six dollars ($6) per day for the supervision of the said work and for all work that he shall perform in the execution of this contract.

3. The party of the first part agrees to pay for all of the materials and labor which shall be used upon this work and to pay for them promptly upon their presentation to her with the O. K. of the party of the second part.

4. The party of the second part hereby agrees, in consideration of the promises and agreement hereinbefore set forth, to carry to completion the aforesaid building for the compensation of six dollars ($6) per day for every working day between now and the date of the completion of the said building.

5. The party of the second part hereby agrees to keep a record of all moneys expended, either for labor or for materials and to present correct bills for the same promptly to the party of the first part.

6. Both parties to this contract hereby agree that the said building shall be entirely completed not later than the first day of May, 1915.

7. Both parties to this contract agree that all of the trim used in said building shall be furnished by R. A. Sherman's Sons Company and that the same shall not exceed the sum of one thousand (1000) dollars and shall contain all such items as were specified in the statement on October 6, 1914 by the said R. A. Sherman's Sons Company to Bloodgood Tuttle.

In witness whereof the parties have hereunto set their hands and seals the day and date first above written.

JEAN M. McNEIL
By ARCHIBALD McNEIL.

DAVID SYME."

It will be observed that, by the terms of this agreement, especially the first clause thereof, the earlier agreement of September 14, 1914, between Connor and Syme and the defendant Jean McNeil was entirely superseded, abandoned and annulled and the parties thereto became divested of any rights whatsoever thereunder.

The matters of which the plaintiff Syme now complains and upon which he now seeks a recovery in the present suit occurred prior to February 20, 1915, the date of the agreement abrogating the first agreement of September 14, 1914, and he would therefore be powerless to sustain his action so long as the former agreement remained effective. In order to clear from his pathway this obstructing agreement, the plaintiffs pleaded that it was obtained by the fraud and false representations of the defendants and through the mistake of the plaintiff Syme. There was no evidence offered as to mistake. The plaintiffs, at the trial, undertook

to show a deliberate fraud on the part of Mr. McNeil at the time the agreement of February 20, 1915, was executed.

The charge of fraud set up in the replication of plaintiffs is to the effect that the release was obtained by fraud and misrepresentation, by which the defendants falsely and fraudulently represented to the plaintiffs that if they, the plaintiffs, would execute and sign the release that defendants "would pay all bills contracted on account of the erection or repair.or addition to that certain building or dwelling of said defendants or work done incident to the same, and that after the signing of said release they said plaintiffs would and should proceed to finish the work on said house and all sums due at the time of the execution of said release would later be paid, to wit, at said Westerly, wherefore the said plaintiffs say that the said release in said plea mentioned is void in law."

Mr. Syme had comparatively little to do with the carrying out of the contract prior to the agreement of February 20, 1915, between himself and Mrs. McNeil. Although work was commenced about September 18, 1914, it was not until the early part of February, 1915, that Syme made the acquaintance of Mr. or Mrs. McNeil, and he had never seen them on or about the property previous to that time.

Connor withdrew altogether from the firm of Connor & Syme about December 24, 1914, and was in no way associated with the matter thereafter. He did not appear as a witness at the trial. It was the retirement of Connor that brought Syme into action and led to the new arrangement, between him and the McNeils looking to the completion of the work, expressed in the release and contract of February 20, 1915.

At the time when this contract was executed, Mr. Syme states quite positively that he signed it upon the express undertaking, on the part of Mr. McNeil, that he, McNeil, would pay outstanding bills. Mr. Charles E. Sherman, President of the R. A. Sherman & Sons Company, testified that he was with Syme at the time of his interview with

McNeil relative to the contract of February 20, 1915, and heard the conversation between the parties. The Sherman Company was a creditor to the amount of some $3,000 for lumber furnished for the house in question. As Connor had disappeared and Syme was not a person of financial responsibility, Mr. Sherman would naturally feel that the chances for obtaining the payment of the Sherman Company account would be greatly enhanced by a recovery in this suit. Even under the influence of a self interest, the testimony of Mr. Sherman, taken as a whole, is not convincing as to the alleged promises of Mr. McNeil. After stating that Syme showed to McNeil a list of outstanding bills to the amount of some three or four thousand dollars he goes on to say, "Mr. McNeil told Mr. Syme that he realized that the job was going to cost more than it was originally contracted for. He was—didn't want to have him lose any money, and he wanted to make a new agreement to have Mr. Syme continue the work. . . . At that time, after a little discussion, McNeil told Mr. Syme that he would enter into a new agreement with him and he refused to pay the matter of three thousand dollars to us, which was represented by notes from Syme to our corporation. . . . He told Mr. Syme that he wanted him to continue the work and that at the end of the job he would see that all outstanding accounts against the job were paid."

Later Mr. Sherman says, "I think that list of bills had a direct bearing on the matter under discussion" but he is not positive that Mr. McNeil made any statement relative to those particular bills which amounted to some three or four thousand dollars; that he cannot recall any conversation directly referring to that sum of money and that he only has a clear recollection that Mr. McNeil said he would "pay all accounts on completion of the job."

By the new contract, entered into on February 20, 1915, Syme was to superintend the work at a fixed compensation per day and Mr. McNeil was to pay for materials and labor. Inasmuch as Mr. McNeil had positively refused, as Mr.

Sherman states, to pay his company the $3,000 due for lumber used in the building, it is not probable that, in using the language which Mr. Sherman attributes to him, he intended to promise anything more than that he would pay such bills as should be outstanding at the completion of the job and under the new contract. When Mr. Sherman says, "I think that list of bills had a direct bearing on the matter under discussion" he is simply stating an impression which, so far as appears, is not justified by anything which Mr. McNeil said. Mr. Sherman finally says, referring to the list of bills which Mr. Syme had, "I am not absolutely positive as to any statement he made relative to these particular bills."

As before stated, Connor retired from the firm the latter part of December, 1914, and the work was carried on by Syme after Connor left down to February 20, 1915, when the new agreement was made, and during that time McNeil made no payments to Syme. It would seem, therefore, that on February 20, 1915, there must have been outstanding bills which had been incurred by Syme in his prosecution of the work after Connor had quit both the job and the firm. That being so it is possible, assuming that McNeil at the interview of February 20, 1915, preceding the execution of the agreement of that date, uttered the words attributed to him by Syme, that he may have referred to the later bills contracted by Syme subsequent to the retirement of Connor.

It is somewhat significant that at the time of the execution of the new contract, or immediately following it, McNeil paid outstanding bills to the amount of $3,245.07 and that on February 11, 1915, nine days prior to the new contract, Mr. Tuttle, the architect, who was a witness for the plaintiff, had written Mr. McNeil, "If you will be able to send Mr. Syme $2000, to take up his note in Westerly and $1161.75 he will be able to complete the job and pay all bills." Mr. Tuttle had previously, on December 29, 1914, written Mr. McNeil, "I visited Musicolony Thursday and managed to get most of the bills for labor, etc., paid up." The payment

by Mr. McNeil of $3,245.07 on February 20, 1915 for outstanding bills, taken in connection with the letters of Tuttle, the architect, above quoted from, makes it difficult to see how other bills to the amount of $4,113.72 could have been outstanding on February 20, 1915. Mr. Syme claims that most of this amount is for extras. The architect's certificate showed $539.10 due on December 24, 1914, with nothing expended for extras. If the claim, which is the subject of this suit, is valid there must have been due upon this house on February 20, 1915, $7,359.79. Why and for what such a sum was required does not clearly appear. The note of Syme to the Sherman Company could not be included to make up the sum covered by the alleged agreement of Mr. McNeil to pay outstanding bills because he had positively refused to assume that obligation.

Mr. McNeil and Mr. Farron, his counsel, the latter being present during a considerable portion of the interview, both deny that there was any statement made by Mr. McNeil to the effect that he would pay the bills which were outstanding on February 20, 1915.

The declaration consists of the common counts and is supplemented by a bill of particulars embracing various items to the amount of $5,835.69. The item of $1,257.74 for commissions was waived. The other deductions, bringing the claim down to $4,113.72 do not appear. The jury after being out for a time returned for instructions desiring to know the amount the plaintiff claimed to be due him, and were informed by the court that it was $4,113.72, and a verdict for that sum followed.

Up to December 24, 1914, McNeil had paid to Connor & Syme $3,906.90. This money passed into the hands of Connor as a member of the firm of Connor & Syme. There is no evidence as to what he did with the money. There is nothing to show that it was used in the payment of any bills for work or materials which went into the erection of this house. For aught that appears Connor may have retained it and later appropriated it to his own use on retiring from the

firm, claiming it as his share of the partnership effects, or he may have applied it in some other way not in reduction of the outstanding bills for which claim is now made. If this amount of $3,906.90 was not appropriated to the payment of bills contracted in the erection of this house the alleged claim of the plaintiffs would be correspondingly reduced.

The trial justice, discussing the case in his rescript upon the defendants' motion for a new trial, expresses his dissatisfaction with the verdict in several particulars. He says, "The evidence disclosed a situation in regard to the contract and specifications which rendered it impossible to know what was included in the written contract. The question of extras had to be determined entirely from the testimony of Tuttle and Syme. We do not believe Syme had any clear idea of extras. If plaintiff's verdict rested upon this evidence alone, it should not stand."

In speaking of the alleged promise of McNeil on February 20, 1915, to pay outstanding bills, the rescript says, "the Court was inclined to believe that McNeil did not make an absolute promise, nor intend to make an absolute promise that he would pay all outstanding bills against the job, and that his promise was not as absolute as Sherman and Syme remembered it. Neither Syme nor McNeil knew anything about the use to which the money ($3,906.90) paid to Connor had been put, nor whether that money had been applied to the job. An agreement such as McNeil is said to have made would have been unusual for a business man of McNeil's experience;" the court adding, although it might be "consistent with McNeil's impatience about the job and his honest desire to pay for what he got even though he felt that he was being imposed upon."

The rescript further says that, "Syme's testimony as to what took place on his visit to Mrs. McNeil is evasive and unsatisfactory. In fact, Syme's whole testimony was not altogether candid. He had suffered financial loss and been imposed upon, and uncertain just where to lay the blame was seeking to place it upon some one other than himself."

In referring to the agreement of February 20, 1915, sometimes called the release, the court said, "We cannot agree with the jury's finding on the question of fraud in procuring the release."

The trial court finds a "confirmation for the jury's finding in the unfavorable impression created by Mr. McNeil. He acted in a testy manner on the stand and was impatient. . . . This manner was probably due, as he said, to the fact that it was his first time in court after a business experience of something over 50 years."

The trial court further accounts for the verdict by saying that "Mr. Syme . . . was a small carpenter who faithfully did his work and was victimized either by Tuttle or Connor, or both, and it was not unnatural, under the circumstances, that the jury should have felt a very strong sympathy for his position. . . . The case on the facts, therefore, is one where we should like to, but do not feel warranted in granting a new trial."

From these excerpts from the rescript of the trial judge his estimate of the verdict is readily discernible. He felt constrained to deny the motion for a new trial in order to avoid any infringement upon the province of the jury, whose duty it is to determine the facts, perhaps overlooking the power of the Superior Court to grant new trials whenever its superior and more comprehensive judgment teaches it that the verdict of the jury fails to administer substantial justice to the parties in the case. *McMahon* v. *The Rhode Island Company,* 32 R. I. 237.

While the denial of the motion for a new trial may be said to be a formal approval of the verdict, it is evident from the rescript that the verdict, in the opinion of the trial court, failed to do justice between the parties and would have been set aside had the court felt that it was possessed of the power to do so. The conclusion of the trial judge therefore cannot be given the weight and consideration to which it might otherwise be entitled. *Campbell* v. *Cottelle,* 38 R. I. 320.

We are of the opinion that in the interests of justice the case should be submitted to another jury.

The defendants' first and second exceptions are overruled. The third exception to the denial of the motion for a new trial is sustained and the case is remitted to the Superior Court with direction to give the defendants a new trial.

*Herbert W. Rathbun, John J. Dunn,* for plaintiff.
*Fitzgerald & Higgins, Wayne H. Whitman,* for defendant.